Thank you, Madam Chief Judge. Can you hear me? Yes, we can hear you. Okay. Good morning, Your Honors, Chief Judge, and may it please the Court. James Suttle on behalf of the Appellant, Mr. Michael Molitor, Your Honors, this case embodies, as a prime example, the impropriety not only of summary judgment in a case that is so riddled with factual disputes, but also in some cases the misuse of that procedure by the district court in several ways, which I'll discuss throughout my argument today, but specifically the weighing of the to Molitor as it should have been, but actually directly against Molitor and in favor of the City, who was the movement in this case, and finally, making several credibility calls, which I'll go over. But I think typically, Chief Judge, when I've appeared before the Fifth Circuit, I've tried to structure my argument as sort of following my causes of action, my first cause of action, second cause of action. Here, I've decided to do something different. I don't think that that's helpful. I think in this case, there are three key issues that the district court decided that if we can resolve those issues, it makes the resolution of the case itself easier. And some of those issues, in some cases, they cross-pollinate between the causes of action. In some cases, they're isolated to a particular cause of action. The three issues I'd like to structure my argument around are, first, the comparator issue, whether these patrol captains were, in fact, similarly situated. Second, the issue of public concern. Is this topic they were discussing truly an issue of public concern? And third, the issue of temporal proximity and knowledge as it relates to the ADA claim. And so with those three issues broadly as the outline of my argument, I'll proceed to the first, if I may. The first, the comparator standard. It needs no repeating. Your Honors don't need any repeating for this, but just briefly, the comparator standard is not identical. It is nearly identical. As the famous Lee versus Kansas City Southern case talks about, the Turner case talks about, we are not looking at identical, but nearly, nearly identical. In this case, what do we have? We have a patrol captain who, to his other three patrol captains, they're identical. They hold the exact same job. As to their responsibilities and their duties, the exact same responsibilities and the exact same job duties. As to their supervisor, the exact same supervisor, first reporting to Major Fortenberry and then up to Chief Wall himself. Finally, after that, they got the same directive and the same command, the famous October 19, 2022 directive to, quote, unquote, patrol more, which is what's going to be at issue today. So the directive and instruction they received was the same. At this point in time, respectfully, I don't think that we have nearly identical. I think we have identical comparators. What about the fact that your client was previously disciplined for parking up? And so unlike the other people on patrol, officers on patrol, your client had a previous disciplinary incident for the exact same thing that he was purportedly terminated for. Right. I think that that's the two areas. It's the only area, really, the city can focus on because they are identical outside of that particular issue. Well, are they identical in terms of the number of hours that they were guilty of parking up? I mean, he's a patrolman. He's supposed to be on patrol. And for nine or ten hours a day, he's parked up at a residence. So was everybody else parked up as often as for as long a period of time as he was? Okay. So Judge Gray has a few points to that. First, the 2022 discipline, which is what we're here about, actually did not involve parking up at a residence. And I'll get to that in a little bit. He was parked up at the Victory Worship Center where he was doing his admin work. So that's the first distinction. Well, residence or no parked up means you're not patrolled. Yes, but here's the problem and what all of these different witnesses testified to in the civil service hearing. These aren't just patrolmen. These are captains. And when I asked every single one of these people at the civil service hearing, will you admit that patrol captains have administrative duties they do while they're also patrolling, the answer by all six in supervision was yes. While you are parked up, and I think this is a big misnomer in this case, while people are quote-unquote parked up or they're idling, there's a sense that idling sort of equates to not doing your job. Here's why that's wrong. When you're an administrator, when you're a captain, you are doing administrative jobs such as reviewing reports, scheduling your officers, doing admin duties that you are doing while you are parked up, even doing legal research in some instances. So the problem with the idea that I was idle for a certain number of hours equates to laziness or not doing the job is a fundamental misunderstanding here. That's what his supervisors thought. So we're not here to audit the police procedures. We're here, I mean, his supervisors thought there was too much parking up going on both in 2019, I think it was, and in 2022. So they might, yes, you might fill out a report or read a report, but they didn't think you needed to be doing that seven hours a day in front of, whether it's the church or your girlfriend's house, either one, they didn't think you should be doing that seven hours a day. And so that's their choice, their business decision, and why isn't your client then not similarly situated to the other people, which we're trying to decide whether you made a case with comparators that should survive summary judgment. Let's bring it back to that. Are you similarly, is your client similarly situated given that he was previously disciplined in 2019 for this parking up and the other people weren't? Yes, Judge, I do briefly want to address the argument that that's not what supervision thought about admin duties, but let me put that aside and answer directly your question. Your question was, how do we deal with the violation history? I think two prongs. First, it is actually a fact dispute as to whether he was actually even disciplined in 2009. The HR department representative, when she was in deposition, confirmed that that discipline was dismissed. So there is a fact dispute as to whether or not he actually was disciplined in 2019. That's first. Secondly, the discipline itself in 2019, is it self-troubling and is it self-discriminatory in this way? Chief Wall, and this is, the record on appeal on this is 1131, 1132, and I encourage the court to look at this. Counsel, during the civil service hearing, when questions were being asked of Chief Wall, there was a representation made that Chief Wall doesn't know the disciplinary history of any of his other captains. Here's why that's troubling. If you're going to discipline this captain based upon his history, and I'm not saying that's a bad thing, it's probably a good practice to look at the history of all your employees before meeting out certain discipline. My problem here is, you chose one. You chose one of four captains to look at their history to see what was his full scope of his disciplinary history. What they would have seen had Chief Wall actually non-discriminatorily and uniformly looked at the history of all the officers, is that Molitor was not the only one who had prior discipline. Captain Jordan had prior discipline back in 2019. The problem was the chief was more than willing to extend informal counseling sheets to clarify his directive to three of his captains because of the four captains in the small police department, 100% of the captains, all four, all four of the captains were disciplined for apparently not complying with this patrol more directive, which raises questions as to whether or not this directive truly was very clear or unambiguous. Counsel, help me a little bit with the background. How large a city is Salford? Very small city in Louisiana, about 30,000 people, an even smaller police department, probably about 30 police officers. And so with those 30 police officers, you had four captains. This directive is given to quote-unquote patrol more, and this is where I want to circle back if I can, Judge, to your previous comment about the fact that the supervision didn't agree with that. Respectfully, that's not true. Supervision did agree that there are administrative duties that captains do. Where the disagreement always was, and the question that I posed and never got a clear answer to was this. Chief, how much more is more? And how much time is too much? And why couldn't answer that makes completely logical sense. They couldn't answer it because it depends upon the day. If I'm writing reports for a murder, I'm going to spend more time parked up writing that report than if I was writing traffic tickets. Is there any evidence in the record that your client was writing reports for murder and this is why he was sitting parked up for seven to nine hours a day? Is that in the record? As to what specific reports my client was writing, no, I don't believe it. Or that he was writing copious reports more than anyone else and that this justified his parking up as opposed to his colleagues, his comparators? I believe in the IA investigation, Your Honor, which is found at Record on Appeal. It's a rather large IA investigation, but it's Record on Appeal 1519 through 1543, so it spans several pages. The IA investigation actually looks at not only the miles patrolled, but it also looks at the number of reports written, so I would encourage Your Honor to look at that because it does show the number of reports that Captain Molitor was writing. Another point that I would raise, though, about the IA report while I'm talking about it and showing further the discriminatory motive here, the directive was given on October 19th of 2022. If you look at the IA report, the IA report pulls data from March through July of that year. So very interestingly, before the directive is even given to these captains, the only officer who has an IA investigation launched against him is Molitor, not the other three captains. In that investigation, they pulled data from months prior to when the directive was even given. That IA report is very troubling, I think, for the city, not only in the fact that it shows how many reports were written, but also in the fact that it shows that they were pulling data from before the directive was given. That being said, I do want to turn to a comment that both Judge Graves has made and that Chief Judge Elrod, you have made. I think I've talked about the violation history, the 2019 history, but you've raised questions about comparable seriousness, and this sort of closes the loop, if we can, on the comparator issue. The final thing is comparable seriousness, and I want to talk about that. As it relates to comparable seriousness, this is all we have in the record. What we have in the record are the counseling sheets, and we have the discipline of Molitor. Every single one of these captains was disciplined for the exact same thing. The same investigator... So let me be... I just want to be clear. You're disagreeing that he was parked up more than anybody else, more than any of the other captains. You're disagreeing with that. Only in part. I don't disagree that he was parked up more. I disagree with how much more, and the reason is because we have asked for the data logs and we have asked for the GPS, which I would think, if it was as devastating to our case as the City likes to paint it to be, they would give them that to us. They do not have the data logs. They don't have the GPS of any of the other captains. They only had the data for our captain. The only reason why I partially disagree with it is simply because they haven't produced the data that we've asked for. So the only thing that we have that tells us how much time the other three captains... This is what's creating sort of a fact dispute about how we look at comparable seriousness of violations. We actually don't know the number of hours the other captains were parked up because they lost the evidence or they don't have the evidence. What we have in this case... How long was the shift? A shift would be 12 hours, yes. So if you're parked up nine and a half hours out of the 12-hour shift, you'll agree with me that's a significant portion of your shift where you're parked in one, you're in one place. That is a significant portion. And you're a patrolman. You're a patrol captain. All right, but the captains have to patrol, don't they? That is part of their duty, yes. That's part of their job, yes. So when we look at comparable seriousness, it creates a real fact dispute for us as to exactly how much time was spent between these various captains. Can I ask a question about that? Yes, of course. Did your client himself testify or admit in some written document that he had the least number of miles patrolled and the most hours parked up at a time in the same location of all four captains in October and November 2022? Did your client actually admit that? My client did not state it that way. I think the way that that was stated to him was as follows. He was shown a lot of the GPS data logs and he was shown a lot of the tracking information from the IA. And what my client said was he was there. And so these sort of conclusions that we're coming to about the data, he was never presented with it that way and said, have you sat up more than your fellow comparators or your fellow patrol captains? What he was asked was, do you dispute the data? And he said, no, I don't dispute the data. So if the data shows that, then that would be a fair summary of it. But it was never presented in that way. But I think it's important to reemphasize. Before your time expires, take me back to where you are in the state courts. Here we're talking about a 30,000 population municipality running a police department. You have a parallel procedure going over parking out an internal administration. You're now, as I understand it, the 14th Judicial District Court reinstated all of the penalties and appealed to the Louisiana Court of Appeals, the Third Circuit, who declined to exercise it, and leaving, therefore, the reinstated penalties intact. And certiorari now remains pending in the United States Court of Appeals, troubling us, spending the time dealing with, however a police officer spent too much time, whatever. What I'm saying to you, why isn't the state process and procedure, what's the status there? Sure, Judge Higginbotham, the procedure in the state courts were that the Civil Service Board unanimously ruled in our favor of returning the discipline. From the Civil Service Board, you are correct, the 14th JDC, the 14th Judicial District Court reinstated the discipline. Right. The Court of Appeal after the district court, simply without deciding any issues of the case, simply stated that they're going to decline to exercise supervisory jurisdiction. We took a writ of certiorari to the Supreme Court, which it was pending for quite some time in front of the Supreme Court. It wasn't until recently, I want to say. What's the status of that? In the last month or two, it was relatively recently. It was relatively recently. The Supreme Court denied our writ of certiorari in that case, and I would just remind the Court that a denial of writ with no other reasons, and there were no other reasons given, holds no precedential value. You know, you didn't get a chance to talk about your part issues two and three, and I think that you should give you each side two extra minutes, and that way you can open up and talk about your issues two and three, but you have two minutes to do so. Okay. All right. Well, thank you, Judge. I appreciate that. Yes. As to the second issue, the reason why I focused on public concern is because the district court's opinion very, very narrowly on the issue of the First Amendment simply dealt with public concern in a very deft comment, sort of dismissed it and said, this is not a matter of — Keep your voice up, please. Okay. Simply said, this is not a matter of public concern, and moved on. The remainder of the analytical prong about a First Amendment retaliation claim was never fully analyzed or threshed out. I actually think from the record evidence that we have in this case, the remainder of the First Amendment retaliation claim is not altogether complicated. There's no question that he was — that he suffered an adverse employment action. There's no question, I think, even on the causal connection. If you look at Chief Justice's civil service hearing as to why he did what he did, it was directly related to this particular polyamorous relationship. I think the key issue here is, was he speaking on an issue of public concern? And I think that there can be — I don't know that this is our case, but I think there could be — if someone wanted to make the argument that private relationships that people are engaged in is a matter of private concern and shouldn't be discussed in the public, the only problem with that argument is, it's not the American experience. We are utterly fascinated with relationships and what people are doing with them, even jurisprudentially. We go as far back as Griswold v. Connecticut, the States of Interest in banning contraceptives, Loving v. Virginia, banning interracial marriages, Bowers v. Hardwick, banning what consensual adults do, Lawrence v. Texas, reversing the same, United States v. Windsor, the DOMA, Oberfeld v. Hodges, dealing with consensual relationships. And in Oberfeld, there's commentary about polyamorous relationships being treated in the same way, or the idea that that may be coming down the pike regarding, if we're going to rule this way with same-sex marriages, what do we do with this relationship construct and these consensual adults in that relationship construct? Are those issues in the State litigation? The State litigation, because it was civil service, the State litigation was primarily focused on whether that discipline was fair and issued with just cause and in good faith. So it was focused upon whether or not the discipline was appropriate. The constitutional issues have been focused in this proceeding, in the Federal proceeding. Thank you. Thank you, Judge. Thank you. We have your argument, and you've saved time for rebuttal. Thank you, Chief Judge. I'm sorry, did you have something, Judge Wittenbaum? No. Thank you. You may proceed, sir. May it please the Court, Greg Belfour on behalf of the City of Sulphur. The questions asked by the Court are what I wanted to address. If you look at the testimony that was at page 1123 of this record, Michael Molitor clearly says that if you look at the other officers, he was fourth in terms of ours actually patrolling, and he was first in terms of time sitting up. He did that in the context of should the other officers have been disciplined like he was disciplined. So it wasn't a discussion of something other than were you the worst, and he admitted he was. He simply thinks that his discipline should have been a lot lighter. That falls far short of proving that he was discriminated against on the basis that he had a wife and a girlfriend, and the Court asked an interesting question about public concern. For a moment, I'll address that before I get to some other issues. To me, it's not a question of whether speech on sex is a public concern. I mean, you only have to look at the news. You know everybody talks about sex. It's whether or not having a wife and a girlfriend is speech that's protected by the First Amendment. And in this case, there's nothing that I can find that says it is. It's not whether talking about sex is not a public concern. It's whether his conduct was a public concern. As interesting as that issue might be for a law school class. I'm sorry, I'm a little hard of hearing. As interesting as that issue might be for a law school class, of whether polyamory is a protected class, whether engaging in it and promoting it is a public concern, that's certainly an interesting legal issue. What does that issue actually have with the facts of this case and whether this gentleman was disciplined for not patrolling in the car? Excellent question. And it doesn't, because it's not the but-for cause of the discipline. It is not a but-for cause of the discipline. If we look at the comparators for a moment, Plaintiffs' Council makes a good point about other officers. But these other officers didn't have the history that Michael Molitor had. Mr. Sudduth points out that the chief's instructions about stop parking up, start patrolling are unclear. Now, what reasonable juror is going to look at that and say, Mr. Molitor, yeah, it's not clear. You were disciplined in 2019 for at least seven hours parking up, and you didn't need to know that nine hours was too much when seven hours was too much. That's not a reasonable basis to send this to a jury. There's also an issue of what's in the record. There's nothing in the record about how many hours the other officers, the other captains parked up. But whose burden is it to present that to the court? Isn't that the plaintiff's burden? If the plaintiff is saying that nobody introduced that, that's correct. But the city didn't, because it's not the city's burden to prove that other people were comparators. If he's saying that he didn't have the information, then that's wrong, too, because not in the record is the discovery, and there are hundreds of pages of records, GPS records of other captains that were produced in discovery. Whose burden was it to produce that to the court so that the court could look at these other captains and say, hey, they were on equal footing or not equal footing? There is no fact dispute about whether Molitor was disciplined in 2019. Molitor himself admitted that he was disciplined both in the civil service hearing and in his deposition. He admitted he was suspended. In his deposition, he said he lost two weeks of pay. Chief Lewis Coates, who was the chief of police until the middle of the summer of 2022, is the one that disciplined Molitor, and his testimony clearly is that he not only suspended him, he demoted him. But when it came time for the civil service board to hear it, there was a compromise. The actual demotion was rescinded, and he was actually suspended for nine days, not 14. And the actual number of days are listed in the personnel action form, the PAF, that goes along with discipline in civil service. So I don't know how there's a dispute other than saying that Connie Ryan said it in her deposition that the suspension was rescinded. She submitted an errata sheet, I'm sorry, two days late. Mr. Sudduth is correct, it was two days late. It was submitted on the 13th, not the 11th. And in it, she changed her testimony, and her change was, hey, I went back and looked at the records, the pay records. I confused 2019 and 2022. So there really is no fact dispute about Molitor being disciplined in 2019. That is unlike the other officers. And let's talk about Captain Jordan for a moment. He was asked in the civil service hearing in 2019, were you demoted? The answer was no. Were you suspended? No. Could it have been a counseling sheet that you got? It could have been. But what's a counseling sheet? It is a non-civil service record that you were spoken to or written to about some conduct that is inappropriate. It's removed from the permanent records, the permanent personnel file, after a year. So if Chief Wall had gone back and looked at the records, he would have seen no counseling sheets, which is consistent with Molitor's testimony that he himself gave, that he was unaware that any other captain in 2019 was disciplined for excessive parking up. He was unaware of whether or not any of the other captains had even received a counseling sheet. So where is the conflict in the evidence there? Where is the evidence that supports the claim that this polyamorous activity was the reason for the discipline? Did Chief Wall admit that this was some kind of vendetta? I'm sorry? Did the Chief Wall admit or say anything that at any time pertinent that this was some kind of vendetta because they didn't approve of his girlfriend and wife situation? Not to my knowledge, Your Honor. Is there anything in the record that shows that? The most vicious thing, I believe, that was said was when Mr. Molitor brought his wife and a girlfriend to a police function. In the record, there's Mr. Molitor's testimony that someone said, that's weird. But it wasn't the chief that said that and no one tried to throw him out? No. He didn't get assigned to a bad patrol the next Monday or something like that? No, Your Honor. In fact, if we look at all of this, there's an absence in the record of evidence that the polyamorous activity was even a consideration when the discipline was administered by Chief Wall. And remember, Chief Wall didn't take over until the end of September 2022. And what he wanted to do was change the focus of the department. He wanted more patrols. Testimony in the civil service hearing was that when Chief Wall took over, there had been some laxity in patrolling, probably because of COVID. And that's understandable. You don't want your officers out there doing more than they have to do getting exposed to COVID and then exposing citizens to COVID. And Chief Wall wanted to turn that around. And that's in the record in the civil service testimony. So he started looking at not only captains, but at sergeants and patrol officers. Contrary to what's in the brief on behalf of Mr. Molitor, that didn't begin on November the 19th. The testimony of Chief Wall was that began on around November the 1st. In fact, if you look at, I believe it's paragraph 20 or 21 of the complaint, it says that on November the 1st, Chief Wall had instructed Major Fortenberry to start looking at the patrol habits of others. So the fact that there was a November the 19th memo that dealt with supposedly focusing on Michael Molitor ignores the fact that the chief was focusing on everybody. If you look at the counseling sheets of the three other captains, which were introduced in evidence by Mr. Molitor's counsel, you'll note that for Captain A, who was Captain Jordan, that he was written up, given a counseling sheet because his patrol officers weren't patrolling enough. So if Major Fortenberry wasn't looking at patrol officers in addition to captains, how did that end up in the written counseling sheet? Do you have anything else, sir? Say again, please. Do you have anything else, sir? I could go on and on about some of the fact issues that are attempted to be created by Mr. Sudduth, and I'd compliment him. He's done a good job in presenting cases to this court, but they don't deal with the real issue, is why was Mr. Molitor disciplined? Judge Graves has a question. Yes, sir. When Mr. Molitor was disciplined in 2022, and they point this out, that he was the only address from which he was prohibited from parking up again at that address was the address of his girlfriend. And he points to that as evidence that his relationship, his girlfriend and wife relationship, had something to do with the disciplinary action that was taken against him. How do you respond to that? That question was asked in a different way of Chief Wall during the civil service hearing. He was asked to explain, in essence, what caused you to use that as part of the discipline. He explained in not so eloquent words that in 2017, Mr. Molitor was parking up at this same residence, his then girlfriend's house. In 2017, there was a stabbing right at that residence involving the then brother-in-law of the then girlfriend. Michael Molitor walks up to the scene and in Chief Coates testimony was not undressed, but wasn't completely fastened up in his uniform. Then Chief Wall explained that in 2022, when he looked at the records, you could see that Mr. Molitor would essentially report to work, leave, go by his then girlfriend's house, go park up at Victory Worship, would go back by his girlfriend's house and then go to his house, which was outside the city limits. Interesting traveling and not patrolling the city. But that concerned Chief Wall because if you look at it, Mr. Molitor, then Captain Molitor, had not given up going to his former girlfriend's house. And Chief Wall felt that he didn't want to be responsible if there was something else that happened at the girlfriend's house. And he didn't really care what Mr. Molitor did on his own time, but he wasn't to go to his girlfriend's, former girlfriend's house in a police unit or during his work time, the 12 o'clock shift. When he was on duty. Say again? He said when he was on duty working his shift. Correct. He was prohibited from going there. Correct. Any other questions? Thank you. I think we have your argument, sir. Thank you. You saved time for rebuttal. Yes, I have. Thank you, Chief Judge. There's a few points I need to address. I'll try to be as quick as I can. But first, I have to do with this remarkable contention. I respect my opposing counsel, but this contention that Chief Wall never made any comments directly about this. He was directly asked why this prohibition was in place. And Judge Graves, you're absolutely right about the prohibition, but there's more about it. There's an attempt by the defense to conflate a period of close to six or seven years, 2017, 2019. Let's not forget, there was an agreement to dismiss the appeal and all the discipline in 2019. They came to an agreement. This attempt to bring back violations from 17 and 19 that have been dealt with and re-discipline again in 2022 is itself concerning. But we're here about 2022. And in 2022, by the admission of every single person in administration, the place where he was parked up too much was Victory Worship Center. Yet in a stunning turnaround, the only address he is banned from in 2022 is not an address where he's spending a considerable amount of time. He's banned from 512 Crocker Street, his girlfriend's address. If you wanted to achieve your legitimate stated ends, which is, I'd like my captain patrolling more, you'd ban him from Victory Worship Center where he was spending time. So when asked, why did you inexplicably include 512 Crocker Street, which in 2022 is no longer a relevant issue, this was his response. And this is why I find the comments remarkable. Quote, that was known, that's where Sergeant Molitor's at one point girlfriend lived. With him being married and visiting someone while on duty in a city unit, it's just as chief, I felt obligated to make that decision for him not to go there. That's it, record 1126, 1132. When I pressed him, so was this a moral decision? Do you have a moral problem with this relationship construct? Quote, didn't want people looking at this married man who was part of the department, who had a girlfriend on the side, end quote. Now, those are Wall's direct statements in civil service about why he did what he did and included Crocker Street. So it's a remarkable contention that didn't play into the discipline. His discipline was not only markedly more, but it was markedly targeted. Also, one of the things that came out was in 2022, 512 Crocker Street, if he would go to it, unlike Victory Worship Center, he'd go and spend a limited amount of time like for lunch, which Wall himself admitted, if you want to go, even if you're on duty and have a lunch break with her, that's fine. But the prohibition didn't carve out exceptions for that. It was a blanket prohibition on that address. I have to turn back, I apologize, Your Honors, but I have to turn back to the issue of the comparators and put this in its right and proper context. It is important to note that we are at summary judgment and the decision about whether or not these people are proper comparators is a mixed question of fact and law. I think we have established at least the bare minimum indicia that this creates a fact dispute because we've shown same position, same title, same job duties, same directive, same location, same supervisor. When you establish that, the only things that are really in dispute here are the comparableness of the violations and the comparableness of the violation histories, and that's why Turner is instructive. In Turner, what this court itself stated was, that, and I love this language from Turner, where Judge Dennis says, Kansas City Southern can still argue these distinctions to the jury, but at this stage at summary judgment, viewing the facts in the light most favorable to the non-movement, we have to allow it forward. And I think that's important here. If they want to try to explain to the jury that 2019, and not Rawls' comments and everything else in the Crocker Street ban, that it was truly their 2019 concern they wanted to relitigate, that's why they did what they did, let a group of fact finders, which is what we did in front of civil service, and five unanimous, reasonable fact finders down in favor of Sergeant Molitor, let them present that to a jury and see what a jury thinks. Another point about where we are at summary judgment, Burdine, we're at the level right now where we're trying to prove our prima facie case, Supreme Court case Burdine. The burden to prove prima facie based on disparate treatment, which is what we're arguing here, is not, quote, an onerous one. And so, therefore, it would be too onerous to impose the identical standard or to create or allow an identical standard versus a nearly identical standard, because that would run afoul of our goal of trying to allow this particular individual to make their prima facie case. And so I'm not going to sit here and suggest that the violation histories of these people are identical or that their comparable seriousness is identical. That would be impossible. What I am suggesting is just like in Lee and just like in Turner, who had differing violation histories, they had differing seriousness, but they were comparable enough to allow a jury to compare it. And that's what needs to happen here is this mixed question of fact and law needs to be allowed that we've met our bare minimum low burden on the law, and we proceed now to a fact question to a jury on these factual differences in violation histories. I see I'm out of time. Thank you so much, Chief Judge, and your honors for your time. Thank you. We appreciate your argument here today. We appreciate your argument as well, sir. And this case is submitted. Thank you both.